Argued and submitted June 23, 2003, reversed and remanded on appeal; cross-appeal dismissed as moot February 25, appellant's petition for reconsideration filed March 8, respondent's petition for reconsideration filed March 10, and response to appellant's petition for reconsideration filed March 15 allowed by opinion April 14, 2004

See 193 Or App 59, 88 P3d 305 (2004)

Treva LANSFORD,
*Appellant - Cross-Respondent,*

*v.*

GEORGETOWN MANOR, INC.,
an Oregon corporation,
dba Ethan Allen,
*Respondent - Cross-Appellant.*

0104-03797; A117930

84 P3d 1105

Scott N. Hunt argued the cause for appellant - cross-respondent. With him on the briefs were Richard C. Busse and Busse & Hunt.

Jeffrey P. Chicoine argued the cause for respondent - cross-appellant. With him on the briefs was Newcomb, Sabin, Schwartz & Landsverk, LLP.

Before Landau, Presiding Judge, and Armstrong and Brewer, Judges.

ARMSTRONG, J.

## ARMSTRONG, J.

Plaintiff appeals from the entry of summary judgment in defendant's favor on plaintiff's defamation and employment discrimination claims. Defendant cross-appeals, assigning error to the trial court's determination that defendant was not entitled to attorney fees under either ORS 20.105(1) or ORS 20.107. We reverse on the appeal and therefore do not reach the cross-appeal.

On review of the trial court's ruling in favor of defendant's motion for summary judgment, we determine whether the summary judgment record, viewed in the light most favorable to plaintiff, shows that there were no genuine issues of material fact and that defendant was entitled to judgment as a matter of law. No genuine issue of material fact exists if no objectively reasonable jury could return a verdict for plaintiff on her claims. Plaintiff has the burden of producing evidence on any issue raised in the motion as to which she would have the burden of persuasion at trial. ORCP 47 C; *see Jones v. General Motors Corp.*, 325 Or 404, 408, 939 P2d 608 (1997).

Plaintiff was diagnosed with panic attacks in 1993. In 1996, she began working for defendant at its Ethan Allen store in Clackamas, Oregon. Plaintiff worked as a designer. In that position, she sold furniture and decorations to customers and was paid on a commission basis. Defendant set a monthly sales goal for all of its designers. If a designer did not meet his or her goal, defendant recorded the deficiency and expected the designer to make additional sales in the following months. For the last eight months that plaintiff worked for defendant, she had a deficit.

In spring 1999, defendant's human resources manager, Gruen, first became aware that plaintiff was having health problems that were interfering with her work. At that time, plaintiff was experiencing back problems. In response, Gruen approved a four-day work schedule for plaintiff. At some point, on which the record is not clear, plaintiff returned to a five-day schedule.

In July 2000, Gruen gave plaintiff a written warning for excessive absenteeism. In the prior six months, plaintiff had missed seven work periods because of illness, ranging from a single day to two weeks in length. In August, after another absence from work because of illness, the manager of defendant's Clackamas store met with plaintiff. In response to that meeting, plaintiff wrote her manager a memorandum about the effect of her health on her work:

"I would like to address the following issues in the Progress Report that we discussed today * * *:

"* * * * *

"I have had several health issues to deal with this year. They have been situations that are beyond my control and each instance of more than one day has been documented by a doctor's note and were not an attempt to gain an unauthorized vacation.

"Since this progress report was written I have experienced another health issue and worry how this will be addressed. Because of this situation I have missed work for the first two weeks of this month and can not possibly meet the required $30,000.00 in sales [for this month]."

On August 31, 2000, Gruen wrote the following memorandum to the store manager:

"Per our conversation this morning regarding [plaintiff], I will forward disability and FMLA [Family Medical Leave Act] paperwork either Friday or Tuesday of next week. If you would please let her know that we should talk sometime next week regarding her situation so that she is taken care of. Either you or [plaintiff] needs to keep me informed as to her status on a weekly basis."

The following day, however, Gruen instructed the manager to ignore that communication:

"Please disregard the previous memo regarding [plaintiff] and FMLA and disability. She needs to bring or send us a doctor's note that indicates she has a serious health condition requiring FMLA and disability. At this point we do not know that. Please keep me posted as to the status of [plaintiff]."

At his deposition, Gruen said that he wrote the September 1 memorandum "because, in either a conversation with [the store manager] or [plaintiff], there—or a combination of both of them, there was apparently no perceived need [to discuss] either [FMLA or disability benefits] at that particular time."

On September 12, 2000, plaintiff wrote Gruen the following letter:

"In response to the progress reports that [the store manager] has discussed with me I would like to inform you of the reason for my recent absences from work. I have been suffering through anxiety/panic attacks that have made it difficult for me to perform my job duties. I have been under the care of a physician and have made weekly visits to get this illness under control. I have provided numerous notes to document these visits and the fact that I was not able to work per my doctor. As noted from my most recent visit to the doctor he feels that I am making progress and the medications we are trying are starting to take affect [sic]. I value my job and clientele base and am making every effort to recover.

"* * * * *

"Due to the type of illness that I am suffering from the mandatory sales goals and being placed on probation are adding significant stress and anxiety. To help with this situation I would ask that I please be removed from probation and be allowed to produce to the best of my ability. * * * I would appreciate any assistance you can provide me during this difficult time."

Plaintiff and Gruen met to discuss the letter and plaintiff's health and her September sales goal. Gruen issued plaintiff another warning on November 1 because, although plaintiff had met her September sales goal, she had failed to meet her October goal. The warning indicated that Gruen was aware of plaintiff's health problems and noted that plaintiff had told Gruen, in September, "that she was having health challenges that were preventing her from performing her sales duties and thus affecting her sales numbers."

On November 10, Gruen wrote plaintiff a memorandum that stated, "While there was some improvement in the

last several months, your absenteeism, health and your ongoing ability to perform concern me greatly." On November 14, plaintiff was given a "final warning" for absenteeism because plaintiff was again absent from work and did not call in sick. The warning stated that

"[plaintiff] must call in to her manager on every occasion that she is not able to report to work. The next time that [plaintiff] does not call or show up for work will constitute grounds for immediate termination."

Also as pertinent here, during plaintiff's employment defendant had a written policy that prohibited an employee from taking merchandise home unless the employee had purchased it. However, the written policy typically was not enforced and employees at the Clackamas store would take merchandise home from the store to see how it looked in their homes before deciding whether to purchase it. In order to keep track of the unpurchased merchandise that they took home, Clackamas employees were required to check out the merchandise by filing an invoice for it. Most employees would either return or pay for merchandise within a week of taking it. Employees did not pay the retail price for the merchandise that they purchased. However, the employee price was not commonly known by employees, and, to obtain the employee price for an item, an employee had to request the price from Gruen or another manager.

In late October 2000, plaintiff decided to evaluate a lamp and a picture in her home before deciding whether to purchase them. She sent a fax on October 25 to Gruen requesting the employee price for those items and filed the appropriate invoice on October 28. Although Gruen had not given plaintiff the employee price, plaintiff took the items home sometime in mid-November. After she took the items home, plaintiff repeatedly asked Gruen for the price, making several phone calls to him and leaving a number of messages for him. Gruen received the messages but did not contact plaintiff with the employee price.

The office manager contacted plaintiff about the items on December 9 and asked her to return them to the store. Plaintiff responded that she would and had been waiting for Gruen to provide her with the employee price for the

items so that she could purchase them. Plaintiff returned the items to the store on December 11 or 12. Plaintiff also asked Gruen for the employee price for the items several times after she had returned them. When asked by her manager and Gruen about why she had kept the items so long, plaintiff said that she had kept them longer than she had intended without purchasing them, but she could not have returned them sooner because of a recent illness and because she needed her roommate's help to move them. She also said that she still wanted to purchase the items and had been planning to do so as soon as Gruen gave her the employee price.

Defendant's handbook provides that an employee can be terminated for "[a]ny act of dishonesty, including theft or misappropriation of money, time, property, or information." On December 22, Gruen circulated a memorandum to all store managers on the employee purchase policy. The memorandum said:

> "Employee purchasing is a privilege. The policy as outlined in the Employee Manual allows employees to purchase special order and in stock merchandise at a substantial discount. Borrowing or loaner merchandise is not allowed! The 'Purchasing Privileges' as outlined in the employee manual states that 'stock merchandise must be paid in full when the sale invoice is written.'
>
> *"Any employee [who] is found to have taken merchandise used for personal use off company premises, may be construed as misappropriation of company property and may be subject to disciplinary action up to and including termination.*
>
> "Please make sure your staff understands Georgetown Manor's policy."

(Emphasis added.) Gruen subsequently determined that plaintiff had misappropriated company property and told the Clackamas store manager, the two other company directors, and the company owners that plaintiff had misappropriated defendant's property. At Gruen's direction, the Clackamas store manager terminated plaintiff's employment with defendant on December 27 for "misappropriation of company property." The manager presented plaintiff with a written termination notice that Gruen had prepared and then fired her.

The notice stated that "[k]eeping unpaid for items in one's possession for such a lengthy period is considered 'misappropriation of company property' as outlined in the employee manual and the employee is subject to termination."

At his deposition, Gruen said that he had no reason to believe that plaintiff intended to steal the items from defendant or to fail to return them. He also said that he had not known how the existing policy on employee purchases was enforced at the Clackamas store until he learned that plaintiff had taken the items for an extended period without paying for them, which had led him to inquire about the policy. At the time that defendant fired plaintiff, another employee also had store merchandise at home. That employee had not followed the proper procedure for checking merchandise out of the store but suffered no adverse consequences.

Finally, as pertinent to the issues on appeal, the record shows that, during the last six months of 2000, plaintiff had at least two panic attacks per month. Typically, her panic attacks lasted from 30 minutes to one hour. Plaintiff described her panic attacks in an affidavit:

"When I have a panic attack my throat and my chest become tight. It becomes hard to breathe. I break out in a sweat. Sometimes I get dizzy. I generally have to stop what I am doing when I have a panic attack. I could not drive a car while having a panic attack. It makes it harder to think when I have a panic attack. * * *

"When I am anxious and experiencing panic attacks frequently, such as I was in the summer and fall of 2000, I also become fatigued. I have trouble sleeping when I am experiencing panic attacks. I can only sleep for a few hours at a time because of the anxious feelings and the tightness in my chest."

We first consider plaintiff's defamation claim, which is based on defendant's statements that plaintiff had misappropriated company property. The trial court granted defendant's summary judgment motion on the ground that "defendant's charge of misappropriation was not untruthful." Plaintiff argues that she has shown that there is a material

issue of fact about the truth of the misappropriation statement and about the other elements of her defamation claim. Defendant counters that, even if we conclude that there is an issue of fact as to the truth of defendant's statement, we should nonetheless affirm the trial court's ruling because the allegedly defamatory statement was not published and because the statement was conditionally privileged and there is no issue of material fact regarding whether defendant abused the privilege.

■■ "To establish a claim for defamation, a plaintiff must show, first, that the defendant made a defamatory statement about the plaintiff. Second, '[p]ublication or communication of the defamatory statement is an essential element of an action for defamation.' In general, a statement is published when it is communicated to a third party." *Wallulis v. Dymowski,* 323 Or 337, 342-43, 918 P2d 755 (1996) (citations omitted). "A defamatory communication is one that would subject another to hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which [the other] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the other]."*Reesman v. Highfill,* 327 Or 597, 603, 965 P2d 1030 (1998) (internal quotation marks and citations omitted).

■ In Oregon "a defamatory communication from one corporate employee to another corporate employee concerning the job performance of a third employee is 'published' for the purpose of a defamation claim." *Wallulis,* 323 Or at 347. Plaintiff produced evidence that Gruen told five other of defendant's managers that plaintiff had misappropriated company property. Defendant argues that, because Gruen spoke only to managers, the rule established in *Wallulis* does not apply and plaintiff has not shown that there is an issue of material fact about whether the statement was published. Defendant does not explain, however, why the five managers should not be considered to be defendant's employees, nor do we perceive any reason why they would not be. We therefore reject defendant's assertion that there is no issue of fact about whether defendant published the statement.

■■ It is for the court to determine whether an allegedly defamatory statement is capable of a defamatory meaning

and for the trier of fact to determine whether the statement was actually defamatory. *Affolter v. Baugh Construction Oregon, Inc.*, 183 Or App 198, 203 n 2, 51 P3d 642 (2002). We review to determine whether the statement that plaintiff was fired for "misappropriation of company property" is capable of a defamatory meaning. That inquiry necessarily focuses on the meaning of the term "misappropriate." Although "misappropriate" can mean to "misapply in use," as the trial court suggested (quoting *Webster's Third New Int'l Dictionary* 1442 (unabridged ed 1993)), it can also indicate a dishonest or unlawful taking. Indeed, defendant's handbook defines misappropriation as "an act of dishonesty." Because the statement that a person acted dishonestly in taking his or her employer's property could "tend to diminish the esteem, respect, goodwill or confidence in which [plaintiff] is held," we conclude that the statement is capable of a defamatory meaning. *Reesman*, 327 Or at 603.

██ ██ Truth is an affirmative defense to a defamation claim. *Bank of Oregon v. Independent News*, 298 Or 434, 437, 693 P2d 35, *cert den*, 474 US 826, 106 S Ct 84, 88 L Ed 2d 69 (1985). Because an objectively reasonable jury could find that plaintiff did not take company property dishonestly, there is an issue of fact about whether the statement was true. The trial court therefore erred in granting summary judgment to defendant on the ground that the allegedly defamatory statement was true.

 Defendant also contends that it had a qualified privilege to make the allegedly defamatory statement.

> "An alleged[ly] defamatory statement is subject to a qualified or conditional privilege if (1) it was made to protect the interests of the defendant; (2) it was made to protect the interests of the plaintiff's employer; or (3) it was on a subject of mutual concern to the defendant and the person to whom the statement was made."

*Affolter*, 183 Or App at 204 (citing *Wattenburg v. United Medical Lab.*, 269 Or 377, 380, 525 P2d 113 (1974)). "The burden of proving an abuse of the qualified privilege, however, rests upon the plaintiff." *Walsh v. Consolidated Freightways*, 278 Or 347, 356, 563 P2d 1205 (1977).

"The privilege may be lost if the speaker does not believe that the statement is true or lacks reasonable grounds to believe that it is true; if it is published for a purpose other than that for which the particular privilege is given; if the publication is made to some person not reasonably believed to be necessary to accomplish the purpose; or if the publication includes defamatory matter not reasonably believed to be necessary to accomplish the purpose."

*Lund v. Arbonne International Inc.*, 132 Or App 87, 96, 887 P2d 817 (1994) (citing *Schafroth v. Baker*, 276 Or 39, 45, 553 P2d 1046 (1976)).

Plaintiff argues that defendant abused any qualified privilege that it had because it lacked reasonable grounds to believe that the allegedly defamatory statement was true and because defendant did not publish the statement to protect defendant's interests but because of defendant's discriminatory animus towards plaintiff. We assume for these purposes that defendant had a qualified privilege to make the statement and consider whether there is an issue of fact about whether defendant abused the privilege. Plaintiff presented evidence from which a jury could find that defendant believed that plaintiff intended to pay for the merchandise once she got the employee price for it from Gruen and, hence, that defendant did not believe that plaintiff was trying to steal the merchandise. A jury could therefore conclude that defendant lacked a reasonable basis to believe that plaintiff had engaged in a dishonest act. Because we conclude that an issue of fact exists about whether defendant abused the qualified privilege, we do not address whether the statement was published to protect defendant's interests.

Plaintiff submitted evidence that created issues of material fact on each of the grounds on which defendant based its summary judgment motion. It follows that the trial court erred in granting summary judgment to defendant on plaintiff's defamation claim.

We turn to plaintiff's employment discrimination claim. ORS 659A.112(1) provides that "[i]t is an unlawful employment practice for any employer to * * * discharge from employment" a "disabled person" who is "otherwise qualified" because of the person's status as a "disabled person." ORS

659A.100(1) defines a "disabled person" as "a person who has a physical or mental impairment which substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." An impairment substantially limits a major life activity if it "renders the person unable to perform a major life activity that the average person in the general population can perform" or "restricts the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner and duration under which the average person in the general population can perform the same major life activity." ORS 659A.100(2)(d).

The Bureau of Labor and Industries, as authorized by ORS 659A.805(1)(e), has promulgated rules to implement the statute. Under OAR 839-006-0205(6)(b),

"[t]o be substantially limited in the major life activity of working, a person must be significantly restricted in the ability to perform a class of jobs or a broad range of jobs in various classes as compared to the ability of an average person with comparable skill, experience, education or other job-related requirements needed to perform those same positions."

OAR 839-006-0212 identifies additional factors to use to determine whether an individual is substantially limited in a major life activity:

"(1) The following factors should be considered in determining whether a person with an impairment is substantially limited in a major life activity:

"(a) The nature and severity of the impairment;

"(b) The duration (length of time) an impairment persists or is expected to persist; and

"(c) The permanent or expected long-term effect resulting from the impairment.

"(2) The determination of whether an individual is substantially limited in a major life activity must be made on a case-by-case basis."

A person is "otherwise qualified" to perform a job if "with or without reasonable accommodation [the person] can perform the essential functions of the position." ORS 659A.115.

Defendant moved for summary judgment on plaintiff's disability discrimination claim on the grounds that plaintiff had failed to show the existence of a material issue of fact about whether she was a disabled person—*i.e.*, that she was substantially limited or regarded as substantially limited in a major life activity—or that she was terminated because she was a disabled person. The trial court ruled in favor of defendant on both grounds.

■ Plaintiff argues that she is substantially limited by her panic attacks in her major life activities of working and sleeping,[1] that defendant regards her as so impaired, and that defendant terminated her because of her substantial limitation or what it regarded as her substantial limitation. We consider those points in order. First, " '[w]hen the major life activity under consideration is that of working, the statutory phrase "substantially limits" requires * * * that plaintiffs allege [that] they are unable to work in a broad class of jobs.' " *Evans v. Multnomah County Sheriff's Office*, 184 Or App 733, 740, 57 P3d 211 (2002) (quoting *Sutton v. United Airlines, Inc.*, 527 US 471, 491, 119 S Ct 2139, 144 L Ed 2d 450 (1999)). Plaintiff argues, and the record shows, that her panic attacks occurred, on average, once per month and lasted for 30 to 60 minutes and that the effects of those panic attacks sometimes required her to miss work—most notably for a two-week period at the beginning of August—but that she was generally able to stay at work during her panic attacks. When plaintiff's panic attacks occurred at work, she was sometimes able to work through them but at other times would stop work until the panic attack was over. The record also shows that plaintiff had a total of ten panic attacks at work between August 13 and December 27.

■ On that record, we conclude that the evidence in the record was insufficient to support a finding that plaintiff's panic attacks substantially limited her major life activity of working. The attacks were of relatively short duration and

---

[1] Plaintiff did not present sufficient evidence to raise a material issue of fact about whether defendant had any knowledge that plaintiff's panic attacks limited her ability to sleep. We therefore reject plaintiff's assertions that defendant fired her because she was substantially limited in her major life activity of sleeping and that defendant regarded her as so limited and discuss only her assertions regarding the major life activity of working.

generally had little residual effect. More significantly, the record does not show that there is an issue of fact about whether the attacks significantly restricted plaintiff's ability to work in a broad class of jobs.

Plaintiff nevertheless argues that, even if her panic attacks did not severely limit her major life activity of working, she was a "disabled person" because "defendant regarded her as disabled and was motivated by [that] misperception in terminating her." We turn to the evidence in the summary judgment record that bears on those issues.

On the issue of defendant's perception that she was disabled, plaintiff relies on Gruen's comments that plaintiff's "absenteeism, health, and * * * ongoing ability to perform" were causing defendant great concern and that her "health challenges" were interfering with her ability to meet her sales goals and the repeated concerns that were expressed about plaintiff's attendance and performance in defendant's evaluations of and warnings to plaintiff.

In *Hardie v. Legacy Health System*, 167 Or App 425, 6 P3d 531, *rev den*, 332 Or 656 (2000), we considered and rejected a plaintiff's assertion that the trial court had erred in granting summary judgment on the plaintiff's claim of disability discrimination. The plaintiff argued that she had presented evidence that would allow a jury to conclude that her employer had regarded her as substantially limited in her major life activity of working. The plaintiff worked for the defendant as a buyer from 1988 until April 1996 and, until December 1995, had received generally positive performance reviews that occasionally "noted inconsistency in her work performance and morale." *Id.* at 428. In October 1995, the plaintiff's supervisor was replaced. In mid-December, the plaintiff and her new supervisor, Davis, had a disagreement in which Davis noted that the plaintiff's speech amounted to "insubordination" against Davis. Davis conducted her first performance review of the plaintiff a few days later and determined that the plaintiff's performance was "unacceptable" and noted the plaintiff's "frequent absences due to illness, her frequent tardiness and smoke breaks, and her chronic backlog of work." *Id.* at 429. Davis learned on January 24 that the plaintiff would not be attending work for

an extended period because of stress. *Id.* During the following months, the plaintiff worked only a day and a half in a different department for her employer and was eventually fired.

The strongest evidence that Davis, and therefore the defendant, regarded the plaintiff as a disabled person consisted of notes that Davis made on January 29. Those notes said:

" 'When [plaintiff] called in sick with another migraine on 1/23/96, it was not a surprise. * * *

" '[Plaintiff] appears to have things in her personal life which are causing her to be unable to perform her work, and she needs to get treatment and find resolution. I support whatever services Legacy makes available to its employees at times such as this in an individual's life.

"* * * * *

" 'Should [plaintiff] recuperate from her stress and wish to return at Legacy, it is my understanding that the organization is obliged to find a position for her which is amenable to her prognosis for coping and performance at that time. There is not any anticipated diminishment of stress in the Purchasing Department over the coming year, inasmuch as we have taken on substantial additional commitment of work in support of the organization.' "

*Id.* at 429-30. Evaluating whether the evidence presented by the plaintiff would allow a reasonable jury to infer that the defendant believed the plaintiff to be disabled, we concluded that "the record [was] devoid of any indication that [any of defendant's employees] perceived plaintiff as" unable to perform the work of a buyer, because Davis's notes indicated only that "Davis perceived plaintiff's personal situation as temporary and that Davis contemplated its resolution and plaintiff's recuperation." *Id.* at 440. We concluded that "[t]he most that can be inferred from Davis's notes is that her *particular department* may not be amenable to plaintiff because of the stress involved in *that department,* but [the notes do] not support an inference that Davis believed that plaintiff could not perform the work of a buyer." *Id.* (emphasis in original).[2]

---

[2] Under the statute in effect when *Hardie* was decided, an employee was a "disabled person" if the employer believed that the employee could not perform "the

■ The evidence presented here is distinguishable from that presented in *Hardie*. Defendant's statements about plaintiff's health, performance, and absenteeism, combined with repeated discussion of plaintiff's condition with her, would allow a reasonable jury to conclude that defendant regarded plaintiff as significantly restricted in her ability to work because of her panic attacks. The evidence does not indicate that Gruen thought plaintiff's panic attacks were tied to or only affected her work for defendant. Rather, Gruen's statements would allow a reasonable jury to infer that defendant believed that plaintiff's panic attacks would keep her from working in a broad class of jobs because the panic attacks kept her from regularly attending work and thereby significantly limited her ability to perform in a broad class of jobs. Thus, there was an issue of fact regarding whether plaintiff was a disabled person by reason of defendant regarding her as such.

We turn to whether the evidence presents an issue of fact about whether defendant terminated her *because* she is a disabled person. "The intent to practice * * * discrimination exists in the mind of the person practicing it and, unless it is an openly declared policy, is apt to be difficult to prove. * * * An inference drawn from the conduct giving rise to the particular charge or cause of action may be the only proof available." *McCuller v. Gaudry*, 59 Or App 13, 17, 650 P2d 148 (1982). Plaintiff argues that "defendant's proffered reason for terminating plaintiff—misappropriation of company property—is untrue" and that, because defendant repeatedly noted that plaintiff's health was interfering with her work goals, "a reasonable jury could find that defendant * * * used the misappropriation charge as a pretext to hide discrimination." Plaintiff argues that the "jury can infer the ultimate fact of discrimination from the falsity of * * * employer's explanation" for the termination.

---

work involved" in the employee's position with the employer. *Hardie*, 167 Or App at 439. The standard for determining whether a person is regarded as substantially limited in the person's major life activity of working has changed since *Hardie*. The standard now requires a plaintiff to establish that the plaintiff's disability substantially limits the person's ability to work in a broad class of jobs. *See* OAR 839-006-0205(6)(b).

■ Plaintiff's argument relies, in part, on the federal burden-shifting approach to so-called "pretext" discrimination cases. *See, e.g., McDonnell Douglas Corp. v. Green,* 411 US 792, 802-05, 93 S Ct 1817, 36 L Ed 2d 668 (1973). However, we do not follow the federal approach to pretext claims under Oregon law. *City of Portland v. Bureau of Labor and Ind.,* 298 Or 104, 114-15, 690 P2d 475 (1984). In Oregon, a plaintiff must establish that the plaintiff's employer took an adverse employment action against the plaintiff based on the plaintiff's protected characteristic. Therefore, we must determine whether the evidence in the record would allow a jury reasonably to "infer that the defendant discriminated against the plaintiff * * * because of the plaintiff's * * * protected characteristic. If that inference may reasonably be drawn, then the claim should be submitted to the trier of fact." *Durham v. City of Portland,* 181 Or App 409, 421-22, 45 P3d 998 (2002) (citing *City of Portland,* 298 Or at 114-15). Opposing a motion for summary judgment on a plaintiff's employment discrimination claim, the plaintiff's burden is " 'so minimal as to be virtually impervious to a motion based on evidentiary sufficiency.' " *Hardie,* 167 Or App at 437 (quoting *Callan v. Confed. of Oreg. Sch. Adm.,* 79 Or App 73, 78 n 3, 717 P2d 1252 (1986)).

Although we concluded in *Hardie* that the plaintiff had not submitted evidence that created an issue of fact on her disability discrimination claim, we concluded that she had submitted evidence that created an issue of fact on a retaliatory discrimination claim. The employer in *Hardie* claimed to have fired the plaintiff because she had abused her position by buying a microwave oven with the employer's funds and then not paying for it for five months until the employer requested payment. The evidence showed, however, that, before they had learned about plaintiff's purchase of the oven, the plaintiff's supervisors had considered firing the plaintiff in connection with her having filed a workers' compensation claim. We concluded that a reasonable juror could infer that the defendant had decided to fire the plaintiff because she had filed a workers' compensation claim. We explained that a defendant does not defeat a plaintiff's showing of material facts on an employment discrimination claim

" 'merely because [the] defendant asserts a nondiscriminatory reason which may or may not persuade the trier of fact.' " *Hardie*, 167 Or App at 437 (quoting *Henderson v. Jantzen, Inc.*, 79 Or App 654, 658, 719 P2d 1322, *rev den*, 302 Or 35 (1986)).

The evidence in this case also indicates that, before defendant became aware of facts to support the ground that it cited for terminating plaintiff's employment, it considered terminating her employment for other reasons. Specifically, the evidence demonstrates that, before Gruen learned that plaintiff had "misappropriated company property," Gruen had given plaintiff a number of warnings linked to her repeated absences from work, and he was greatly concerned about the effect of plaintiff's health on her work. On that evidence, a jury could reasonably infer that defendant fired plaintiff because of the disability that defendant perceived her to have. Defendant's evidence that it terminated plaintiff because she misappropriated company property would not preclude the jury from drawing that inference.

Because plaintiff has produced evidence that would allow a reasonable jury to conclude that defendant perceived her to be a disabled person and terminated her because of that perception, the trial court erred by granting summary judgment to defendant on plaintiff's employment discrimination claim. Because we reverse on plaintiff's appeal, defendant's cross-appeal is moot.

Reversed and remanded on appeal; cross-appeal dismissed as moot.