Argued and submitted November 23, 2005, reversed and remanded
February 15, 2006

Michael S. KIRKWOOD,
*Appellant,*

*v.*

WESTERN HYWAY OIL CO.,
an Oregon corporation,
*Respondent.*

WESTERN HYWAY OIL CO.,
an Oregon corporation,
*Counterclaim Plaintiff,*

*v.*

Michael S. KIRKWOOD,
*Counterclaim Defendant.*

0211-11372; A125269

129 P3d 726

Charles Robinowitz argued the cause and filed the briefs for appellant.

Sarah J. Ryan argued the cause for respondent. On the brief were Mitchell C. Baker, and Ball Janik LLP.

Before Edmonds, Presiding Judge, and Brewer, Chief Judge, and Wollheim, Judge.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiff brought an employment discrimination claim against defendant, his employer, alleging that defendant violated ORS 659A.040(1) by terminating his employment in retaliation for filing a workers' compensation claim. The trial court granted defendant's motion for summary judgment, ORCP 47 C, and entered a judgment of dismissal. Plaintiff appeals, arguing that the trial court erred in granting the motion because there are genuine issues of material fact. We reverse and remand.

■ We review the summary judgment record in the light most favorable to plaintiff to determine whether there are genuine issues of material fact and whether the moving party, defendant, is entitled to judgment as a matter of law. ORCP 47 C; *Jones v. General Motors Corp.*, 325 Or 404, 420, 939 P2d 608 (1997). We draw all reasonable inferences from the record in favor of plaintiff, and we will affirm only if no objectively reasonable factfinder could return a verdict for plaintiff. *Id.* Where a plaintiff presents *prima facie* evidence of discrimination, and an employer offers evidence of a nondiscriminatory motive, a genuine issue of material fact exists and the employer cannot prevail on summary judgment. *Hardie v. Legacy Health System*, 167 Or App 425, 437, 6 P3d 531 (2000), *rev den*, 332 Or 656 (2001). Here, in its order granting defendant's motion for summary judgment, the trial court held that "there is no evidence that plaintiff's termination by Western Hyway Oil Co. in November 2001 was in any way caused by, in whole or in part, or related to, plaintiff's use of the workers' compensation system."

We begin with the undisputed facts. Plaintiff worked as a gasoline truck driver for defendant from 1996 until November 13, 2001, when he was discharged. In 1997, plaintiff injured his back and filed a workers' compensation claim. On January 3, 1999, he severely injured his left wrist while loading his truck at a gasoline facility in Portland, which was owned by Equilon Enterprises. He filed a workers' compensation claim for the wrist injury and later filed an action for negligence against Equilon. In the summer of 1999, plaintiff discovered that the extent of his injury was worse than originally thought. Plaintiff then had two surgeries on his wrist

and either was off work or worked in defendant's office for about a year and a half. His condition was deemed medically stationary on August 22, 2000, and his workers' compensation claim was closed on January 10, 2001. In a deposition, Glenn Zirkle, defendant's vice-president, was asked,

"Q. Did [plaintiff]'s injury affect the companies [*sic*] mod rating? M-O-D?

"A. *Yes.*

"Q. And what's stand [*sic*] for? I'm sorry.

"A. Mod rating. Two words.

"Q. Do you know if the company had to pay any money out to either Liberty Northwest or [plaintiff] as a result of his working claim and as opposed to a higher mod rating or a higher premium, generally?

"A. I—I don't know what the results were with this accident.

"Q. Was this a fairly serious accident as far as the company was concerned?

"A. It was serious in the extent of the duration that it had [plaintiff] out of employment. That certainly affects how much time Liberty is helping an employee get through that transition time.

"Q. Is this one of the bigger claims that the company's had in the last ten or fifteen years?

"A. Probably among the bigger."

(Emphasis added.) The negligence action against Equilon was settled in September 2001, and on November 5, 2001, plaintiff's attorney sent a check for $49,631.56 to defendant's workers' compensation insurance carrier as reimbursement for monies paid pursuant to the workers' compensation claim. The reimbursement amounted to approximately 65 percent of the total cost of the claim to defendant's carrier. On November 13, 2001, plaintiff's supervisor, Ron Burke, discharged him.

The parties view the rest of the facts differently. Plaintiff alleges that, on the day he was fired, Burke refused to give him a reason for the discharge. When plaintiff

returned the following day to pick up his final paycheck and asked Burke why he had been fired, Burke told plaintiff that he would tell him the reason on another occasion. Plaintiff telephoned Burke about two weeks later to again ask the reason for his discharge, and Burke told him he would tell him in person because "the walls have ears."

In contrast, defendant asserts that Burke discharged plaintiff because on October 31, 2001, plaintiff got into an argument on the phone with a truck dispatcher, George Steagall, regarding the reassignment of one of plaintiff's deliveries to another driver, part of which Burke overheard. Plaintiff cursed and was disrespectful to Steagall. Steagall reported the incident to Burke and told him that plaintiff had also criticized Burke. Burke claimed that, later the same day, he conducted a sampling of defendant's time sheets. He compared them to defendant's "tach charts," which are produced by a computer in each truck and identify when a truck is moving and at what speed. Burke stated that he found discrepancies between the time sheets and the tach charts, which led him to believe that plaintiff was claiming more time than he actually worked. Burke went on vacation the next day, but testified that, by the time he returned to work, he had decided to fire plaintiff. When Burke returned to work on November 12, Steagall told him that he had received a telephone call from another driver warning Steagall that plaintiff was "telling people he was going to have someone come in and beat [Steagall] and [Burke] up." Burke then determined that he would fire plaintiff immediately. He asserted that the decision to fire plaintiff was his alone, that he did not consult with any other person before making that decision, and that he was not instructed by anyone to fire plaintiff. He also claimed that plaintiff's workers' compensation claim did not factor into his decision to fire plaintiff and that he had no knowledge of the settlement of plaintiff's negligence action against Equilon.

Plaintiff does not deny that he became upset at Steagall and used coarse language. He asserts, however, that he had never had an argument with Steagall before, that he had apologized to him the following day, and that Steagall had accepted the apology. Plaintiff denies making any kind of threat. He argues that it was not uncommon for drivers to

yell at dispatchers when loads were reassigned, because reassignment meant that the original driver would be paid less, and that no other driver had ever been fired for yelling at a dispatcher. In addition, plaintiff presented deposition testimony from Zirkle that no employee had ever been fired for similar altercations with dispatchers. Plaintiff also asserts that his time cards accurately reflect the actual time he spent working and that other drivers with discrepancies on their time cards had not been fired. He also submitted a statement from Zirkle's deposition in which Zirkle said he could not recollect whether anyone had been fired for those kinds of discrepancies. Plaintiff also points out that Burke did not compile the list of time card discrepancies until January 9, 2002, and he argues that Burke knew of the settlement of his negligence action against Equilon because Burke was to be a witness at the trial in that case and because plaintiff had informed him of the settlement in September 2001.

■     Finally, plaintiff contends that defendant failed to follow the disciplinary procedure outlined in its employee manual, which states, in part:

"XVI. DISCIPLINE

"Employees who violate company policies or rules or who otherwise do not meet the standards for conduct or performance of their jobs are subject to disciplinary action by the Company, up to and including discharge. The Company will ordinarily follow progressive disciplinary steps in the order listed below. However, Company reserves the right to omit any of the steps in the progressive discipline procedure if the Company in its sole discretion believes that doing so is appropriate in a particular case, given the seriousness of the offense.

"Types of disciplinary action, in increasing level of seriousness, include:

"1.   Oral warning or reprimand.

"2.   Formal counseling by a supervisor with a written reprimand placed in the employee's personnel file.

"3.   Suspension with or without pay or placement on disciplinary probation for a specified period of time.

"4. Discharge."

Although plaintiff acknowledges that the policy provides that the steps in the disciplinary procedure may be omitted, he argues that he was treated differently from other employees for the same conduct because of his workers' compensation claim.

ORS 659A.040(1) provides:

"It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS chapter 656 or has given testimony under the provisions of those laws."

To establish a *prima facie* case under that provision, a plaintiff must show

"(1) that the plaintiff invoked the workers' compensation system; (2) that the plaintiff was discriminated against in the tenure, terms or conditions of employment; and (3) that the employer discriminated against the plaintiff in the tenure or terms of employment because he or she invoked the workers' compensation system."

*Hardie*, 167 Or App at 433.

On appeal, defendant concedes that plaintiff satisfied the first two elements of a retaliatory discrimination claim, but argues that plaintiff failed to produce any evidence that would permit a reasonable factfinder to infer that the discharge was retaliatory. Defendant points out that plaintiff was discharged nearly three years after he filed his second workers' compensation claim, and therefore asserts that there can be no inference that the discharge was motivated by the filing of the claim. Defendant also argues that it had two legitimate reasons to fire plaintiff—his insubordination and the inaccurate time cards—that plaintiff was an employee-at-will, and that its disciplinary policy expressly provided that termination of employment could occur without prior warning and at defendant's discretion.

We conclude that the conflicts between plaintiff's and defendant's evidence preclude summary judgment. Plaintiff claims that Burke initially refused to tell him the

reasons for his discharge, and, when later asked, stated that he would tell plaintiff in person because "the walls have ears." Plaintiff also produced evidence that no other driver had been discharged by defendant for insubordinate behavior to a dispatcher or for discrepancies in their time cards. Although it is correct that plaintiff was discharged nearly three years after he filed his second workers' compensation claim, the claim did not close until January 2001, and the negligence action against Equilon was still pending near the time of plaintiff's discharge. Plaintiff also presented deposition testimony from Zirkle that his claim was one of the company's larger claims, evidence from which it could be inferred that it affected the company's "Experience Rating" with the insurance company. All of those facts, when considered together, permit a reasonable inference that defendant had a discriminatory motive when it fired plaintiff. Although defendant's evidence would also permit a jury to draw a reasonable inference to the contrary, the conflicts in the evidence do not entitle defendant to judgment as a matter of law. Because there are genuine issues of material fact, summary judgment was improper.

Reversed and remanded.