Argued and submitted March 24, reversed and remanded September 9, 2009

Sherrie P. HERBERT,
*Plaintiff-Appellant,*

*v.*

ALTIMETER, INC.,
dba Altimeter Transportation Services,
*Defendant-Respondent.*

Lane County Circuit Court
160615881; A136664

218 P3d 542

Michael J. Ross argued the cause for appellant. With him on the briefs was Slater Ross.

Dennis W. Percell argued the cause for respondent. With him on the brief were Katherine G. Watkinson and Arnold Gallagher Saydack Percell Roberts & Potter, P.C.

Before Haselton, Presiding Judge, and Brewer, Chief Judge, and Rosenblum, Judge.

ROSENBLUM, J.

**ROSENBLUM, J.**

After defendant terminated plaintiff's employment, plaintiff brought this action alleging four counts of unlawful employment practices: retaliation for complaining about unsafe working conditions (Occupational Safety and Health Act (OSHA) retaliation); retaliation for invoking the workers' compensation system; retaliation for requesting a reasonable accommodation under the disability discrimination statutes; and perceived disability discrimination. At the close of plaintiff's case-in-chief, the trial court granted defendant's motion for a directed verdict on each count and dismissed the complaint. On appeal, plaintiff asserts that the jury could reasonably have found in her favor on all four counts based on the evidence presented. We agree.

We take the following facts from the record. We view the evidence and all reasonable inferences that can be drawn therefrom in the light most favorable to plaintiff, the non-moving party, "to determine whether the jury reasonably could have inferred that defendant discriminated against plaintiff" on any of the grounds asserted in her claim. *Garcez v. Freightliner Corp.*, 188 Or App 397, 399, 72 P3d 78 (2003); *Harris v. Pameco Corp.*, 170 Or App 164, 166, 12 P3d 524 (2000).

Defendant is a trucking company based in Eugene. Defendant hired plaintiff as a long-haul truck driver in January 2006. Truck drivers are required to undergo a medical history examination and a physical examination to receive Department of Transportation certification. Plaintiff was certified as physically fit to drive commercial vehicles at the time that she was hired by defendant. She was assigned by defendant to truck number 4003.

In the first week of operating her assigned truck, plaintiff reported to Tony Note, one of defendant's vice-presidents, that there was a noticeable smell of exhaust and oil in the cab. A number of repairs followed within the next few weeks: a flex-pipe and band clamps were replaced; a "blowby tube" was replaced (by plaintiff herself) to address the oil smell in the cab; two head gaskets were replaced because the gaskets were leaking either internally or externally; another new flex-pipe was installed to address an

exhaust leak; and an air hose and a turbo clamp were replaced to address exhaust and oil leaks. Approximately two months later, on April 13, another oil leak was recorded on the truck's maintenance log.

On April 19, plaintiff was on the road waiting to make a delivery in Arizona the next morning. Plaintiff had been idling her truck's engine all day in order to run the air conditioner due to the extremely hot weather. She testified that the smell of exhaust in the truck was overwhelming and seemed to be causing her dog to be very lethargic. She was concerned about her health, so, in the evening, she turned off the truck to stop the exhaust smell from coming into the cab. Later, when she tried to restart the motor (in order to cool off), the starter locked up and it was necessary for service to be called in to restart it. The service provider told plaintiff that the starter was beginning to fail and that it probably was not a good idea to turn off the engine. Plaintiff called Tony[1] to inform him of the problem. He advised her not to turn the motor off and to make her delivery the following morning.

The following morning, plaintiff made her Arizona delivery and picked up a new load for delivery in Nevada. Once there, as directed, she went to a truck service center to have the starter checked. While waiting at the service center, plaintiff again kept the engine running, both to keep the cab cool and because she was worried that they might not get to it and she was concerned about "whether the starter would start or not." Earlier that day, plaintiff had called Mike Note, the vice-president of operations, and reported that she was not feeling well—that she was nauseated, light-headed, and fatigued. When she learned from the truck service center that it would not be possible to have the truck serviced until after midnight, plaintiff called Tony and told him that she was not feeling well and did not feel that she could stay up all night waiting. Tony agreed that she could turn the engine off for the night and sleep.

---

[1] To avoid confusion, we refer to Tony Note and Mike Note by their first names hereafter.

The next morning the truck started and plaintiff delivered her load in Nevada. She spoke with Mike that morning and told him that she still was not feeling well. She testified that she felt very ill that day and that she was "gravely concerned" about her health because she was not feeling well, her dog was very lethargic, and she had been breathing the exhaust in the truck for "almost a week straight" at that point.

On April 22, plaintiff returned to Eugene. She reported the exhaust leak to Tony and turned in a repair request. Tony sent the truck to the repair shop. Although the repair personnel found no indication of problems with the starter or exhaust, Tony advised them to replace the starter and the exhaust band clamps.

On the same day, on her doctor's advice, plaintiff had a blood test for carbon monoxide exposure. On April 24, plaintiff's doctor gave her a copy of the test result, which revealed a 9.6 percent level of carboxyhemoglobin.[2] He also gave her a note indicating that her level of carboxyhemoglobin was "consistent with excess exhaust fume exposure = markedly elevated!" Because 48 hours had passed since the blood draw, and plaintiff had not been back in her truck, her doctor ordered a second blood test for comparison.

After seeing her doctor, plaintiff took the result of the first test and the doctor's note to Mike and told him that she was concerned about her exposure to carbon monoxide. Mike told her that she might be able to drive truck number 4010, assigned to Tony, to complete a delivery to Portland. He also told her that, if she liked that truck, he would not object if she wanted to keep it. Later that day, Tony called plaintiff and asked her what was going on. According to plaintiff, she had a "similar conversation" with Tony to the one that she had with Mike. In that conversation, Tony told her that "there had to be some other health issues going on" and that she was a safety risk and should not be driving. He then suspended plaintiff.

---

[2] Carboxyhemoglobin forms in red blood cells when an individual breathes carbon monoxide.

Also on April 24—after the exhaust band clamps on plaintiff's truck had been replaced—Tony arranged to have the carbon monoxide levels in the cab tested by a Eugene-area diesel mechanic, using a gas monitor borrowed from the Springfield Fire Department. The truck was driven for approximately 20 minutes, and the gas monitor continuously showed no carbon monoxide in the cab of the truck. The mechanic also did not smell any exhaust in the cab.

On April 25, plaintiff's doctor received the result of the second blood test, which revealed a 7.6 percent level of carboxyhemoglobin in plaintiff's blood. Plaintiff's doctor considered that to be a significant change and concluded that it was attributable to the fact that she had not been exposed to exhaust in her truck for two days. He wrote her a second note:

"Due to exposure to engine fumes to excess in current truck[,] this patient needs to be in another rig. She has side effects including nausea, burning eyes and throat, weakness, muscle tingling etc."

On April 26, plaintiff brought the second note to a meeting with Tony. Tony was upset with plaintiff and told her that he had spent thousands of dollars on her truck, that her truck could not possibly be having exhaust problems, and that she must have some other health issues. Plaintiff asked Tony, "What's the bottom line here? Are you letting me go?" He said, "Yes." Plaintiff asked if there was another truck she could drive, to which he responded, "No." Plaintiff took out the doctor's second note and asked Tony if he wanted to read it, to which he also responded, "No." Tony told plaintiff that she "shouldn't be driving a truck anymore" and that she was "a risk." Tony also told plaintiff that a test had been performed and had revealed no carbon monoxide in the truck and that her truck's diesel engine did not emit carbon monoxide. At the end of their conversation, plaintiff cleared out her truck and turned in her keys.

Plaintiff initiated a complaint with the Bureau of Labor and Industries (BOLI), and defendant filed a response. Plaintiff later dismissed the BOLI complaint and then initiated this civil action. In her complaint, plaintiff alleged in four counts that her termination constituted an unlawful employment practice. Each count advanced a different legal

theory of discrimination: retaliation for complaining about unsafe working conditions (OSHA retaliation); retaliation for invoking the workers' compensation system; retaliation for requesting a reasonable accommodation under the disability discrimination statutes; and perceived disability discrimination.

At trial, plaintiff testified to the events described above and reported that her symptoms had dissipated a few days after she stopped driving truck number 4003. She also testified that, although she is a heavy smoker, she had never experienced similar symptoms associated with smoking.

Plaintiff offered expert testimony from a diesel mechanic. He testified that exhaust leaks around the flex-pipe and band clamps are very common in the trucking industry, that exhaust leaks can be very hard to find and remedy, and that such leaks can create a risk of carbon monoxide poisoning. He further testified that a review of truck 4003's maintenance log showed that an exhaust problem was reported before plaintiff began working for defendant; specifically, that the truck had a "big exhaust leak" in October 2005. In November 2005, a flex-pipe and the head gaskets were replaced. The witness also stated that carbon monoxide is emitted by diesel engines as a result of incomplete combustion. He noted a report of white smoke associated with truck 4003 in May 2005, which, he testified, could be caused by incomplete combustion.

Plaintiff called Tony as a witness. He testified that he was aware that a safety regulation required that he take a truck offline and repair it if it leaked carbon monoxide into the cab. He acknowledged that plaintiff filled out a maintenance request for an exhaust leak before she was terminated. He stated that he felt that plaintiff could not safely drive any truck until the cause of her symptoms was determined, treated, and alleviated. He confirmed that the truck had had an exhaust leak in 2005, before plaintiff's employment began. He testified that plaintiff's employment "concluded" when they reached an "impasse over whether or not she would be allowed to drive another truck versus checking out the cause of her symptoms and treatment for them." He further testified that he did not follow plaintiff's doctor's advice because

plaintiff's truck did not emit carbon monoxide and, therefore, the truck could not have been the source of plaintiff's health problems. He acknowledged that he could have requested an independent fitness-for-duty exam for plaintiff, but did not do so.

Plaintiff also offered at trial defendant's response to her BOLI complaint. Written by Tony, it stated that, among other reasons, plaintiff's "employment was terminated as a result of * * * [h]er insistence that the employer assign her to another truck and complete disregard for all the reasons why this was neither necessary nor possible."

At the close of plaintiff's case-in-chief, defendant moved for a directed verdict on all four counts in the complaint. The trial court, without elaboration, granted the motion and dismissed the complaint.

■ On appeal, plaintiff assigns error to the grant of defendant's motion for a directed verdict, arguing that she presented sufficient evidence to go to the jury on each of the four counts in her complaint. We review the trial court's decision to grant defendant's motion for a directed verdict for errors of law. *Garcez*, 188 Or App at 399. To prove that an employee was terminated on unlawfully discriminatory grounds, "[i]t is sufficient in Oregon for the plaintiff to show that the unlawful motive was a substantial and impermissible factor in the discharge decision." *McPhail v. Milwaukie Lumber Co.*, 165 Or App 596, 603, 999 P2d 1144 (2000). We have previously noted that a plaintiff's *prima facie* burden in an employment discrimination case is "so minimal that it is virtually impervious to a motion based on evidentiary sufficiency." *Callan v. Confed. of Oreg. Sch. Adm.*, 79 Or App 73, 77-78 n 3, 717 P2d 1252 (1986).

■ We address each of the counts in plaintiff's complaint in turn but, before doing so, we briefly address two arguments that defendant makes that are common to all of the counts. First, defendant contends that, based on the evidence presented at trial, a reasonable juror could not infer that plaintiff's employment was terminated. Defendant acknowledges plaintiff's testimony that Tony indicated to her that she was being "let go," but it notes that plaintiff also testified that the meeting was "a blur" and that she was very upset,

implying that her testimony about the meeting was not reliable. Second, it argues that, even assuming that plaintiff was terminated, Tony believed that the diesel engine in plaintiff's truck could not emit carbon monoxide and, therefore, that plaintiff's health condition could not possibly be related to her truck. Thus, in defendant's view, Tony terminated plaintiff because he believed in good faith that she could not drive any truck safely and because she refused to obtain a diagnosis of and treatment for the true condition causing her symptoms, not for any unlawful reason.

■ Defendant's view of what the record shows is inconsistent with the standards for a directed verdict. A directed verdict in defendant's favor is appropriate "only if there is a complete absence of proof as to an essential issue." *Znaor v. Ford Motor Company*, 213 Or App 191, 193, 159 P3d 1252 (2007). Plaintiff's testimony that Tony terminated her employment by answering in the affirmative when she asked, "Are you letting me go?" is evidence from which a jury could reasonably infer that plaintiff was terminated. It was for the jury to determine whether plaintiff's memory of the meeting was accurate. Plaintiff's admission that she was very upset during the termination meeting and that the meeting was "a blur" would not prevent a jury from drawing the inference that she was terminated.

■■ We reach a similar conclusion with respect to defendant's asserted lawful motivation for terminating plaintiff's employment. Although a jury could infer that Tony terminated plaintiff for the reasons stated by defendant, it could also reasonably infer that Tony's claimed motivation was pretextual and that he actually terminated her for one or more of the unlawful grounds that plaintiff advances. "A plaintiff's *prima facie* case does not disappear merely because a defendant asserts a nondiscriminatory reason which may or may not persuade the trier of fact." *Henderson v. Jantzen, Inc.*, 79 Or App 654, 658, 719 P2d 1322, *rev den*, 302 Or 35 (1986).

■ We turn to plaintiff's arguments, beginning with her count concerning OSHA retaliation. ORS 654.062(5) provides that it is an unlawful employment practice to retaliate against an employee who has opposed any practice forbidden

by the Oregon Safe Employment Act[3] or makes a complaint related to that Act. *See Butler v. Dept. of Corrections*, 138 Or App 190, 201, 909 P2d 163 (1995) ("[I]f plaintiff can establish that he suffered discrimination at his employment because he made a complaint 'related to' safe and healthful working conditions, he has met the elements necessary to establish a claim under [ORS 654.062(5)].").

Plaintiff argues that she presented sufficient evidence that she was terminated because she complained to her employer about an exhaust leak and carbon monoxide poisoning. Specifically, she argues that the evidence showed that, shortly before she was terminated, she complained about an exhaust leak, reported her symptoms, and provided the test results and her doctor's notes, all of which indicated carbon monoxide poisoning.

Defendant responds that plaintiff failed to introduce any evidence showing that defendant terminated her *because* she made the safety complaint. Defendant cites the evidence that, after plaintiff reported a possible exhaust leak, defendant inspected the truck, sent it to a repair shop for further inspection and repairs, and had it tested for carbon monoxide emissions, implying that defendant was responsive to plaintiff's complaint and thus would not have terminated her in retaliation for it. Defendant contends further that, during plaintiff's conversations with Tony on April 24 and 26, in which plaintiff was suspended and then terminated, her complaints about the exhaust leak were never mentioned.

Although the evidence on which defendant relies supports an inference that a jury would be entitled to draw, it is not the only reasonable inference that the record gives rise to. Plaintiff introduced evidence that she was terminated within a few days of reporting what she believed to be an unsafe working condition that was affecting her health. *See Kirkwood v. Western Hyway Oil Co.*, 204 Or App 287, 293-94, 129 P3d 726 (2005), *rev den*, 341 Or 197 (2006) (considering

---

[3] The Oregon Safe Employment Act is codified at ORS 654.001 to 654.295, ORS 654.412 to 654.423, ORS 654.750 to 654.780, and ORS 654.991.

temporal proximity of an employee's engagement in a protected activity to his termination in concluding that a reasonable factfinder could infer that the employer had a discriminatory motive in terminating him). She also offered evidence that defendant was unhappy with plaintiff because her repair requests were costing defendant thousands of dollars. *See McPhail*, 165 Or App at 602-05 (considering fact that the employer was "upset about paying workers' compensation benefits and premiums" in reversing summary judgment in favor of the employer on the plaintiff's workers' compensation discrimination claim). Considered together, those facts are circumstantial evidence that defendant had an impermissible retaliatory motive in terminating plaintiff's employment. *See Wheeler v. Marathon Printing, Inc.*, 157 Or App 290, 303, 974 P2d 207 (1998) (stating that proof of a discriminatory motive "is rarely direct and often, necessarily, circumstantial and inferential"). A jury could reasonably have found that plaintiff's decision to report an unsafe work environment was a substantial factor in her termination. Thus, we conclude that the trial court erred in granting defendant's motion for a directed verdict on the count concerning OSHA retaliation.

■   We next address plaintiff's count concerning workers' compensation retaliation. ORS 659A.040(1) provides, "It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in [the statutes governing workers' compensation]." Plaintiff argues that she presented sufficient evidence that she was terminated because she invoked the workers' compensation system.

Defendant responds first that plaintiff failed to invoke the workers' compensation claim system. Defendant contends that, to put an employer on notice of a job-related injury, an employee must give notice in writing. Moreover, defendant argues, nothing in the record even suggests that workers' compensation was an issue between the parties in the context of plaintiff's termination. In all events, defendant

argues, even assuming that plaintiff did invoke the workers' compensation system, she failed to prove that her invocation was a factor in her termination.

■ We first consider whether plaintiff invoked the workers' compensation system. To invoke the workers' compensation system for purposes of ORS 659A.040(1), a claimant is not required to make a formal claim by giving written notice of an injury or disease. " 'Invoke,' as used in ORS 659A.040, includes, but is not limited to, a worker's reporting of an on-the-job injury *or a perception by the employer that the worker has been injured on the job or will report an injury*." OAR 839-006-0105(7) (emphasis added); *see also McPhail*, 165 Or App at 604-05 (stating that OAR 839-006-0105 correctly defines "invoke," as used in ORS 659A.040; reasoning that, if the employer knew that the plaintiff had an occupational disease, that knowledge constituted a claim, even if the plaintiff had not given the written notice that was required to perfect it, and was sufficient to "invoke" the workers' compensation system). Defendant acknowledged that, in reporting her medical symptoms to the company, plaintiff related her health concerns to her exposure to exhaust in her truck. Tony took steps to investigate whether plaintiff's symptoms were the result of an on-the-job injury by testing the truck's cab for carbon monoxide. A jury could reasonably infer that Tony perceived that plaintiff would report an injury. It follows that plaintiff's evidence was sufficient to create a jury question on that issue.

■ We likewise conclude that plaintiff introduced sufficient evidence for a jury to infer that her invocation of the workers' compensation system was a substantial factor in defendant's decision to terminate her. Plaintiff reported to both Mike and Tony that an exhaust leak in her truck had made her sick. Within a few days, Tony terminated her employment, citing her insistence that the truck had caused her health issues as a factor in her termination. Although the inference may not be strong, we cannot say that, as a matter of law, a jury would not be permitted to draw it. Thus, the trial court erred in granting defendant's motion for a directed verdict on plaintiff's count concerning workers' compensation retaliation.

■    We turn to plaintiff's count concerning retaliation for requesting a reasonable accommodation for a disability. According to plaintiff, her request to be assigned to a different truck constituted a request for a reasonable accommodation under the statutes prohibiting discrimination against disabled persons. She argues that she adduced sufficient evidence that she was terminated for making that request and, thus, that a jury could find that she was terminated because she "utilized the procedures provided for in ORS 659A.100 to 659A.145[,]" in violation of ORS 659A.109. Defendant argues that it could not have discriminated against plaintiff for requesting an accommodation as a disabled person because (1) plaintiff was not disabled and (2) plaintiff did not request any accommodation until after her employment was terminated.

We begin with defendant's argument that no actionable discrimination occurred because plaintiff was not disabled. Defendant contends that Oregon's disability discrimination statutes mandate that the claimant be disabled in order to invoke the protections under ORS 659A.100 to 659A.145. Defendant argues that the duty to provide a reasonable accommodation arises under ORS 659A.112(2)(e) and that the duty is owed only to a "person with a disability."

We agree with defendant that the duty to make a reasonable accommodation is owed only to persons with disabilities. ORS 659A.112(2)(e) provides that an employer commits an unlawful employment practice if it "does not make reasonable accommodation to the known physical or mental limitations of an otherwise qualified person with a disability who is a job applicant or employee * * *." If an applicant or employee is not an "otherwise qualified person with a disability," the employer is not required to make an accommodation. Defendant's reliance on that principle misses the point, however, because plaintiff's claim is based on ORS 659A.109, not ORS 659A.112. Plaintiff contends that defendant discriminated against her not by refusing to provide the requested accommodation, but by terminating her for having made the request.

ORS 659A.109 provides:

"It is an unlawful employment practice for an employer to discriminate against a worker with respect to hire or tenure or any term or condition of employment because the worker has applied for benefits or invoked or utilized the procedures provided for in ORS 659A.100 to 659A.145 [the statutes prohibiting discrimination against persons with disabilities] or has given testimony under the provisions of such sections."

Unlike ORS 659A.112(2)(e), that statute's protections are not limited to a "person with a disability." Indeed, its protections extend expressly even to *witnesses* in discrimination actions, who need not have applied for benefits or invoked or utilized the provided procedures. We therefore conclude that the statute protects from retaliation an employee who seeks benefits or accommodations even if the employee proves not to be disabled and, thus, no accommodation is required. Accordingly, we reject defendant's contention that plaintiff does not come within the statute's protection.

■     We turn to defendant's argument that plaintiff did not request the accommodation—assignment to a different truck—until after she was terminated and, therefore, that the request could not have motivated her termination. Viewing the evidence in the light most favorable to plaintiff, a jury could reasonably find that plaintiff made the request before she was terminated. In arguing to the contrary, defendant relies on testimony from plaintiff suggesting that she asked Tony if she could be assigned to another truck after he told her that he was terminating her employment. Defendant places undue weight on that testimony. Plaintiff also testified that, two days before she was terminated, she had a conversation with Mike, in which he told her that she could drive Tony's truck. It is not clear from the record whether Tony knew of that part of the conversation with Mike. However, plaintiff's case-in-chief also included defendant's response to her BOLI complaint, in which it stated that plaintiff's "employment was terminated as a result of * * * [h]er insistence that [defendant] assign her to another truck and complete disregard for all the reasons why this was neither necessary nor possible." In light of that statement, even

assuming that, at the meeting in which plaintiff was terminated, she did not ask about being assigned to a different truck until after Tony told her that he was "letting [her] go," a jury could infer that that was not the first time she had brought it up.

Because plaintiff presented evidence from which a jury could infer that she was terminated as a result of asking to be assigned to a different truck, we conclude that the trial court erred in granting defendant's motion for a directed verdict on the count based on ORS 659A.109.

We turn finally to plaintiff's allegation of discrimination based on a perceived disability. ORS 659A.112(1) provides:

> "It is an unlawful employment practice for any employer to refuse to hire, employ or promote, to bar or discharge from employment or to discriminate in compensation or in terms, conditions or privileges of employment because an otherwise qualified person is a person with a disability."

ORS 659A.100(1)(c), in turn, defines "person with a disability" as "an individual who has a physical or mental impairment that substantially limits one of more major life activities, has a record of such impairment or is regarded as having such an impairment."[4]

Plaintiff contends that a jury could find that she was terminated because defendant regarded her as disabled—specifically, that Tony regarded her as substantially impaired in the major life activity of employment. In support of that contention, plaintiff relies on the following exchange at trial between Tony and plaintiff's counsel:

> "Q.   Okay. So you felt that her condition was impairing her ability to safely drive the truck?

---

[4] Major life activities include employment. ORS 659A.100(2)(a). When employment is the major life activity under consideration, the phrase "substantially limits" in ORS 659A.100(1)(c) requires that the plaintiff show that he or she is "unable to work in a broad class of jobs" or that the employer so regards the plaintiff. *Lansford v. Georgetown Manor, Inc.*, 192 Or App 261, 273, 84 P3d 1105, *adh'd to as modified on recons*, 193 Or App 59, 88 P3d 305 (2004) (internal quotation marks omitted). Defendant does not contend that plaintiff failed to present evidence that it regarded her as unable to work in a broad class of jobs.

"A.    As communicated, yes.

"Q.    Okay. The—not just her truck but any truck, correct?

"A.    Correct.

"Q.    Okay. Which would, from your perspective, eliminate her work as a commercial driver?

"A.    Until the cause and the treatment of the symptoms—until the cause was determined and the treatment was undertaken and the symptoms were alleviated."

Plaintiff also relies on her own testimony concerning the meeting at which Tony terminated her:

"Q.    Did [Tony] talk to you about your ability or whether you should be a truck driver?

"A.    He uh—he went so far as to tell me that I shouldn't be driving a truck anymore. That I was a risk."

In response, defendant contends that the evidence shows that Tony regarded plaintiff's condition as temporary. According to defendant, Tony consistently assumed that plaintiff's symptoms would likely dissipate and that she would then be able to return to work. For example, defendant argues that, in the response to plaintiff's BOLI complaint, Tony stated that plaintiff "was advised to seek further medical attention to determine and treat the cause [of her symptoms], *in hopes of eliminating the symptoms*, which made her unsafe to drive." (Emphasis in defendant's brief.) Further, defendant notes that Tony testified that he directed plaintiff to "find out the cause of her symptoms, get treatment, and *when they were alleviated*, then she would be qualified to drive the truck that she was assigned to * * *." (Emphasis in defendant's brief.) Indeed, defendant asserts, even in the testimony on which plaintiff relies, Tony testified that she could not drive only "until the cause was determined and the treatment was undertaken and the symptoms were alleviated."

In reply, plaintiff asserts that, notwithstanding the evidence on which defendant relies, a reasonable jury could infer from Tony's statement to plaintiff that she "shouldn't be

driving a truck *anymore*" that he regarded her condition as a permanent impairment. (Emphasis added.)

As defendant's argument implies, a temporary condition is generally not regarded as a disability for purposes of Oregon's disability discrimination statutes. *See* OAR 839-006-0240(1) ("Temporary, non-chronic impairments, with little or no long-term or permanent effect, are usually not disabilities."); *Hardie v. Legacy Health Systems*, 167 Or App 425, 440, 6 P3d 531 (2000), *rev den*, 332 Or 656 (2001) (summary judgment for the defendant in a perceived disability claim is appropriate where the evidence shows only that the plaintiff's supervisor perceived the plaintiff as being incapacitated by a temporary situation and contemplated its resolution and the plaintiff's recuperation). Plaintiff does not contend that her case does not fall within that general rule. Thus, for plaintiff's claim to survive the motion for a directed verdict, plaintiff was required to present evidence that defendant regarded her as having a long-term or permanent impairment.

We agree with defendant that Tony's testimony that plaintiff's condition precluded her from safely driving any truck does not give rise to the inference that he regarded her condition as long term or permanent. That statement cannot be taken out of context: Tony explained immediately thereafter that her condition "eliminate[d] her work as a commercial driver" only "until the cause was determined and the treatment was undertaken and the symptoms were alleviated." In that context, Tony's testimony does not give rise to the inference on which plaintiff's claim depends. Thus, the question reduces to whether a jury could reasonably draw the necessary inference from plaintiff's testimony that Tony told her that she "shouldn't be driving a truck anymore."

We conclude that it could. The import of that statement was that plaintiff was no longer able to work as a truck driver. Although Tony testified that he also told plaintiff that, when her symptoms were alleviated, she would be qualified to drive again, plaintiff did not testify that he made any such statement. A jury would be entitled to disbelieve Tony's testimony and to infer from plaintiff's testimony that he

viewed her condition as permanently precluding her from working as a truck driver.[5] Accordingly, we conclude that the trial court erred in granting defendant's motion for a directed verdict as to plaintiff's count based on perceived disability discrimination.

In sum, we conclude that plaintiff presented sufficient evidence on each of the four counts to overcome a motion for a directed verdict. The trial court, therefore, erred in granting a directed verdict and dismissing the complaint.

Reversed and remanded.

---

[5] The jury would also be entitled to disbelieve Tony's explanation at trial and the statement in defendant's response to the BOLI complaint. Thus, those statements do not undermine the inference to which plaintiff's testimony gives rise.