Argued and submitted January 9, 2018, reversed and remanded March 11, 2020

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

DAVID JAMES,
*Defendant-Appellant.*

Washington County Circuit Court
C150903CR; A162523

462 P3d 734

In this criminal appeal, defendant challenges nine convictions for sexual crimes against two sisters, M and V. The acts of abuse were alleged to have taken place in 1998 and 2003, when M and V were young children. M and V reported the acts in 2013 and 2014, after apparently recovering memories of the abuse, and the charges were brought against defendant shortly thereafter. On appeal, defendant contends, among other things, that the trial court erred by allowing the prosecutor to read from the Third Edition of the Oregon Interviewing Guidelines in order to impeach defendant's expert witness, who testified about the science of memory. Defendant argues that his expert did not testify or admit that the Third Edition of the Oregon Interviewing Guidelines was a "reliable authority," as required by OEC 706 for it to be used as such, and that the state did not show by any other means that that publication was a reliable authority. *Held*: The trial court erred in overruling defendant's objection to the cross-examination. The error was not harmless.

Reversed and remanded.

Janelle F. Wipper, Judge.

Ryan Scott argued the cause and filed the briefs for appellant.

Peenesh Shah, Assistant Attorney General, argued the cause for respondent. Also on the briefs were Ellen F. Rosenblum, Attorney General, and Benjamin Gutman, Solicitor General.

Before Ortega, Presiding Judge, and Egan, Chief Judge, and Powers, Judge.*

ORTEGA, P. J.

Reversed and remanded.

_____

* Egan, C. J., *vice* Garrett, J. pro tempore.

## ORTEGA, P. J.

In this criminal appeal, defendant challenges nine convictions for sexual crimes against two sisters, M and V, which were entered after the jury returned nonunanimous verdicts of 10-2. The acts of abuse were alleged to have taken place in 1998 and 2003, when M and V were young children. M and V reported the acts in 2013 and 2014, after apparently recovering memories of the abuse, and the charges were brought against defendant shortly thereafter. On appeal, defendant contends, among other things, that the trial court erred by allowing the prosecutor to read from the Third Edition of the Oregon Interviewing Guidelines in order to impeach defendant's expert witness, who testified about the science of memory. Defendant argues that his expert did not testify or admit that the third edition of the Oregon Interviewing Guidelines was a "reliable authority," as required by OEC 706 for it to be used as such, and that the state did not show by any other means that that publication was a reliable authority. As explained below, we agree, and we also conclude that the trial court's error was not harmless. That conclusion obviates the need for us to address defendant's other assignments of error, including the assignment raised in his supplemental brief, in which he challenges the court's acceptance of nonunanimous jury verdicts. Accordingly, we reverse and remand.

At trial, the state presented evidence that M and V, who were 21 and 16 years old, respectively, at the time of trial, had recently recovered memories of abuse by defendant, which, as noted above, they believed had taken place 10 and 15 years before they reported it. Defendant's theory of the case was that, although M and V truly remembered being abused by defendant, those memories were false.

That theory relied on the testimony of Daniel Reisberg, a professor of psychology and memory researcher. Reisberg testified about the science of memory and the ways that false memories can be created and existing memories can be changed over both long and short periods of time. He provided examples of studies determining that false memories can be created and that people's memories can and

frequently do change dramatically over time due to influences internal and external to the person.

Among other things, Reisberg testified that the amount of detail that a person remembers about an event generally does not correspond to the likelihood that the memory is correct. When a person has a false memory of an event, the person often remembers the event as taking place in a real setting and thus can provide detail about the setting or circumstances even when the memory of the event itself is incorrect.

Reisberg also testified that, once a memory is truly forgotten—the person does not remember it although they try and although they are exposed to triggers and cues for the memory—a person cannot remember more details about it over time: "As time goes by, you forget. As time goes by, you don't unforget." He also explained that the scientific community of researchers who study memory has now reached a general, though not universal, consensus that "repressed memories"—memories that are subconsciously hidden and re-remembered later—do not exist; "this is just not the way memory works."

On cross-examination, the prosecutor questioned Reisberg about the Oregon Interviewing Guidelines:

"[Prosecutor:] What are the Oregon Interviewing Guidelines?

"[Reisberg:] The Oregon Interviewing Guidelines is a set of guidelines, now in its third edition, from the Oregon Department of Justice that describe proper forensic procedure for interviewing children who may have been the victims of some sorts of abuse.

"[Prosecutor:] And those guidelines are not just from one person at the Oregon Department of Justice. You would agree that they're also a collaboration of most, if not all, of the child advocacy centers across the state of Oregon compiling research, creating guidelines on how to interview a child, how to train people on some of the concepts that you've talked about here today, right?

"[Reisberg:] Well, no, not quite right. I mean, certainly the first edition of the Oregon—the OIG, the Oregon

Interview Guidelines, was written by a crew of people. Dr. Wendy Bourg was the—the leader of the group. I believe there were eight or nine other people involved.

"It's not clear and not well documented what the involvement was in subsequent editions. \* \* \* I mean, the various editions have thanked various people, but the authorship is not clear. So I can't agree that everyone who's conducting forensic interviews in the state has somehow been involved.

"\* \* \* \* \*

"[Prosecutor:]   You would agree that the foreword to the Oregon Interviewing Guidelines, the 2012 third edition—you have reviewed those at some point?

"[Reisberg:]   Yes. I certainly have reviewed the third edition.

"[Prosecutor:]   You would agree that it indicates that it's supported by updated research from a work group comprised of interviewers from Child Abuse Multidisciplinary Intervention Programs, five regional service provider centers that drafted its revisions?

"[Reisberg:]   I mean, I haven't read it recently enough to confirm that those are the words. But if those are the words, then those words are false because the third edition is not updated in line with contemporary research.

"The third edition is, in fact, dramatically worse than the second edition in ways that have never been explained for me.

"[Prosecutor:]   So you personally, as an individual, disagree with the collaboration of multiple child advocacy centers, workers from child advocacy centers and various experts in the interviewing of children?

"[Reisberg:]   Let's be clear here so that, I mean, I represent my views accurately. The first and second editions of the Oregon Interview Guide contained about 260, 270 pages. The third edition basically threw away three quarters of the material, so it's now down to about 60 or 70 pages.

"I have scrutinized the third edition looking for some explanation for why they threw into the garbage three-quarters of the material that was there. I found no explanation for that point. The third edition also systemically

moves away from the science on a number of issues. We can detail that if you like.

"And so I am, in truth, just bewildered by why the high quality second—first and second editions of the OIG were transformed into this much lower quality, which again throws away a lot of important material and fills in a bunch of fluff.

"So, yeah, I mean, I am truly puzzled by the third edition and don't understand what has happened at all.

"[Prosecutor:] Despite your being puzzled, you are aware and you would agree that it is the source on which interviewers across the state of Oregon are trained in—involving interviews at child advocacy centers?

"[Reisberg:] Actually, I would disagree with that. I mean, my conversations with interviewers around the state and my having heard testimony from a number of child interviewers is that they regard the OIG as a document that they have heard about, but their training is much more practical and much more thorough.

"[Prosecutor:] You would agree that Oregon interviewers, including the ones that you've spoken to, are supposed to follow the guidelines created by the Oregon Interviewing Guidelines?

"[Reisberg:] That is my understanding, yes.

"[Prosecutor:] Okay. And you are very well aware because you frequently sit in on cases like this, right?

"[Reisberg:] Mm-hmm.

"[Prosecutor:] You actually observe testimony and gather information about how an interview was conducted, for instance, at CARES Northwest?

"[Reisberg:] That's right.

"* * * * *

"[Prosecutor:] So you're very well aware that it is highly commonplace for a defense attorney to cross-examine in detail child interviewers, first responders, police officers, about whether or not they actually followed the Oregon Interviewing Guidelines?

"[Reisberg:]    I mean, the answer to that is, no, I'm not aware. I mean, certainly I have listened to many of the videotapes of interviews conducted by these people. And I will say with some pride that child interviewers—child interviews *** in this state are usually done fabulously well.

"The interviews at CARES Northwest, at ABC House, at CAC and the other facilities around the state are for the most part terrific. I don't know how they're cross-examined because I've rarely witnessed that event."

Ultimately, the prosecutor asked Reisberg the following question:

"You're aware that the Oregon Interviewing Guidelines under the subject of memory and suggestibility state that, quote, 'Suggestibility is less likely to be a risk when the memory includes strong, salient details that are personal, meaningful and have a direct impact on the child'?"

After some debate between Reisberg and the prosecutor, defense counsel objected to that question on the ground that the prosecutor had not established that the third edition of the Oregon Interviewing Guidelines was a reliable authority. The court overruled that objection, and the prosecutor read the quotation again. Later, the prosecutor read another quotation:

"Are you aware that in that same section under source monitoring the 2012 edition of the Oregon Interviewing Guidelines it *** says, quote, 'It is important to note that it is unlikely that a child will be knowledgeable in detailed sexual activities unless the child'—it says 'he or she'—but 'the child is subject to extended periods of directly witnessing the activity, told in great detail on multiple occasions about how the activity occurs or participates directly in the activity'?"

Defense counsel objected again, and the court overruled the objection. Ultimately, Reisberg acknowledged that the third edition of the Oregon Interviewing Guidelines contained both of those quotations.

On appeal, defendant contends that the court erred in overruling his objections to the prosecutor's foundation

for impeaching Reisberg with material from the third edition of the Oregon Interviewing Guidelines that contradicted Reisberg's testimony. The parties agree that OEC 706 applies here. That rule provides as follows:

> "Upon cross-examination, an expert witness may be questioned concerning statements contained in a published treatise, periodical or pamphlet on a subject of history, medicine or other science or art if the treatise, periodical or pamphlet is established as a reliable authority. A treatise, periodical or pamphlet may be established as a reliable authority by the testimony or admission of the witness, by other expert testimony or by judicial notice. Statements contained in a treatise, periodical or pamphlet established as a reliable authority may be used for purposes of impeachment but may not be introduced as substantive evidence."

Defendant argues that Reisberg did not testify or admit that the third edition of the Oregon Interviewing Guidelines was a "reliable authority." He points out that Reisberg (1) disagreed with the prosecutor's assertion that the third edition was written with input from child advocacy centers, noting that its "authorship is unclear"; (2) stated that "the third edition is not updated in line with contemporary research," that it "threw away" the majority of the higher quality material contained in the first and second editions and "fill[ed] in a bunch of fluff," and that it "systemically moves away from the science on a number of issues"; and (3) disagreed that child interviewers rely on it. Defendant contends that, because the state failed to show that the third edition of the Oregon Interview Guidelines was a reliable authority, either through Reisberg's testimony or in any other way, the court erred in allowing the prosecutor to impeach Reisberg with material from it.

In response, the state contends that Reisberg's answer to the prosecutor's very first question—in which Reisberg said that the guidelines, "now in its third edition," "describe proper forensic procedure for interviewing children who may have been the victims of some sorts of abuse"—coupled with his later concession that Oregon child interviewers are supposed to follow the guidelines, establish that the third edition of the guidelines is "a reliable authority." OEC 706.

The parties dispute what is necessary to establish a treatise, periodical, or pamphlet "as a reliable authority by the testimony or admission of the witness." OEC 706. To resolve that dispute, we first consider the meaning of "reliable authority" as that term is used in OEC 706. We apply our familiar method of statutory interpretation, beginning by considering the text in context, along with any useful legislative history, with the goal of ascertaining the intention of the legislature. *State v. Gaines*, 346 Or 160, 171-72, 206 P3d 1042 (2009).

As a starting point, we consider dictionary definitions of the relevant terms. *See State v. Gonzalez-Valenzuela*, 358 Or 451, 462, 365 P3d 116 (2015) (noting that dictionary definitions may provide a useful starting point for our textual analysis). "Reliable" is defined as "suitable or fit to be relied on : worthy of dependence or reliance : of proven consistency in producing satisfactory results." *Webster's Third New Int'l Dictionary* 1917 (unabridged ed 2002); *accord Black's Law Dictionary* 1291 (6th ed 1990) (defining "[r]eliable" as "[t]rustworthy, worthy of confidence"). All of those definitions include an evaluation of quality; to be reliable, something must be "suitable" for or "worthy of" reliance; it must be trustworthy. *See also* Tape Recording, House Judiciary Committee on Civil Law, SB 47, Feb 24, 1999, Tape 46, Side B (statement of Jeff Johnson, Oregon State Bar Procedure and Practice Committee Member) (in response to concerns about allowing impeachment with pamphlets and periodicals, not just treatises, explaining that, before any document could be used, the proponent would have to "establish[] that it is something that should be relied on from a scientific standpoint").[1]

Consistently with that understanding, in the context of scientific expert testimony, the word "reliable" refers to objectively verifiable scientific validity. *See State v. O'Key*, 321 Or 285, 305, 899 P2d 663 (1995) (noting that the overarching subject of a court's inquiry into scientific expert evidence "'is the scientific validity—and thus the evidentiary

---

[1] The Oregon State Bar's Procedure and Practice Committee proposed the bill. Testimony, House Judiciary Committee on Civil Law, SB 47, Feb 24, 1999, Ex F (statement of Jeff Johnson).

relevance and reliability—of the principles that underlie a proposed submission'" (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 595, 113 S Ct 2786, 125 L Ed 2d 469 (1993)).

The definition of the word "authority" that is most relevant to its meaning in OEC 706 is the following: "an individual (as a specialist in a given field) who is the source of conclusive statements or testimony : one who is cited or appealed to as an expert whose opinion deserves acceptance." *Webster's* at 146. Thus, in general terms, we understand a reliable authority to be a source (1) that is widely cited or appealed to within the relevant community as a source whose propositions or opinions are conclusive or deserve acceptance and (2) whose propositions or opinions are worthy of that community's reliance, that is, whose contents are trustworthy.

The state argues that Reisberg's answer to the prosecutor's first question about the Oregon Interviewing Guidelines, along with his acknowledgment that Oregon child interviewers are supposed to follow the guidelines, provided a sufficient foundation for its use to cross-examine Reisberg. The state contends that this case is similar to *State v. Morgan*, 251 Or App 99, 284 P3d 496 (2012), in which we considered whether a police officer's testimony provided a sufficient foundation for the use of the National Highway Traffic Safety Administration's Field Sobriety Test Instructor's Manual (NHTSA Manual) to cross-examine two officers. We described the testimony, which took place during defense counsel's cross-examination of the first officer, as follows: "Defense counsel *** asked [Officer] May if he recognized the NHTSA manual as the authoritative manual that officers use in analyzing, interpreting, and conducting [field sobriety tests]. May answered: 'Yes, Sir.'" *Id.* at 102. That was the only exchange related to the foundation for the NHTSA manual. *See id.*

That exchange sufficiently established that the NHTSA manual was a reliable authority. We explained that "May acknowledged that the NHTSA manual was the authoritative reference source that police officers use in analyzing, interpreting, and conducting" field sobriety tests and

held that "[t]hat testimony provided a sufficient foundation for its use in the cross-examination of" May and a second officer who testified as an expert. *Id.* at 108.

The state points out that the discussion of the third edition of the guidelines in this case was much longer than the officer's foundational testimony in *Morgan*. That is true, but it is not dispositive. In *Morgan*, the officer's brief testimony was unambiguous that the single authority under discussion—"the NHTSA manual"—was authoritative and that officers relied on it regarding field sobriety tests. Here, by contrast, the first statement that the state relies on does not refer to the particular document that the prosecutor sought to impeach with. Although the state is correct that Reisberg described the guidelines, as a whole, as "describ[ing] proper forensic procedure," he was not referring to the third edition in particular. His additional testimony made clear that the first two editions were reliable and authoritative, but the third edition was not. In light of his additional testimony, it is implausible to understand the first statement as an admission that the third edition, in particular, is a reliable authority. *Cf. Herbert v. Altimeter, Inc.*, 230 Or App 715, 731, 218 P3d 542 (2009) (in assessing the sufficiency of evidence to avoid a directed verdict, explaining that a statement's context limits the inferences that it supports; reasoning that the defendant's testimony that the plaintiff's condition precluded her from safely driving any truck could not be understood to mean that she could never safely drive any truck because the defendant "explained immediately thereafter that her condition 'eliminate[d] her work as a commercial driver' only 'until the cause was determined and the treatment was undertaken and the symptoms were alleviated'").

Likewise, taken in isolation, Reisberg's acknowledgement that child interviewers are supposed to follow the third edition of the guidelines might support the proposition that the third edition is a reliable authority. However, in light of his assertion that child interviewers are not actually trained on the third edition, it is likewise implausible to understand the fact that they are supposed to rely on it as establishing its authoritativeness or reliability. Here, unlike the officer's testimony in *Morgan*, Reisberg's testimony

established neither that the third edition of the guidelines is widely cited or appealed to within the relevant community as a source whose propositions or opinions are conclusive or deserve acceptance nor that its propositions or opinions are trustworthy.

OEC 706 was enacted to fix a problem in trial practice:

> "Under current Oregon law, expert witnesses who testify at trial may be cross-examined by statements in [a] learned treatise only if that expert relies upon the treatise or acknowledges it as a reliable authority. Under this scenario experts can and often do avoid being impeached simply by denying \*\*\* that [a treatise] is an authority."

Testimony, House Judiciary Committee on Civil Law, SB 47, Feb 24, 1999, Ex F (statement of Jeff Johnson). OEC 706 solved that problem "by permitting the proponent of a learned treatise to establish it as an authority in the field either through another expert witness or by judicial notice." *Id*. Thus, faced with Reisberg's refusal to acknowledge the third edition of the guidelines as a reliable authority, the state was free to provide the necessary foundation through its own expert. OEC 706. However, it did not.

On appeal, as an alternative to its argument that Reisberg's testimony laid the necessary foundation, the state asks us to take judicial notice that the third edition is a reliable authority. Relying on *State v. Branch*, 243 Or App 309, 259 P3d 103, *rev den*, 351 Or 216 (2011), the state contends that this case is appropriate for judicial notice because we should be "satisfied \*\*\* that the principles underlying the proffered evidence and the application of those principles to the problem involved are indisputably valid." *Id*. at 323.

We disagree. In our view, the principles set out in the third edition of the Oregon Interviewing Guidelines and their application to the subject at hand are not indisputably valid. Consequently, this is not a case in which it is appropriate for us to take judicial notice on appeal.

Having concluded that the trial court erred in overruling defendant's objection to the cross-examination, we consider whether there is "little likelihood that the particular

error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003); *see also* Or Const, Art VII (Amended), § 3; OEC 103(1) ("Evidential error is not presumed to be prejudicial."). The state does not contend that the error was harmless, and we conclude that it was not.

Reisberg's testimony was critical to defendant's theory of the case; it provided the jury with the only plausible explanation for the counterintuitive argument that M and V could have apparently real memories of abuse that never took place. As set out above, two of the basic propositions of Reisberg's testimony were that there is no direct correlation between the amount or kind of detail that a person remembers and the accuracy of the memory and that people's memories can always be changed over time by external and internal influences. The quotation that the prosecutor read from the third edition of the Oregon Interviewing Guidelines suggests, to the contrary, that a memory is not likely to have changed over time if "the memory includes strong, salient details that are personal, meaningful and have a direct impact on the child."

By impeaching an expert with material from a reliable authority, the cross-examiner shows the jury that the expert's opinions are at odds with reliable, authoritative principles; the impeachment demonstrates that the expert is an outlier in the relevant field and, consequently, that the expert's opinions should not be accepted. *See* Testimony, House Judiciary Committee on Civil Law, SB 47, Feb 24, 1999, Ex F (statement of Jeff Johnson) (the purpose of cross-examining an expert with a learned treatise is "to demonstrate that the principles upon which the expert relies are flawed or that the expert has inappropriately departed from mainstream authority as set forth in [a] learned treatise in the field"). The foundation requirement safeguards the integrity of the trial by requiring that, before making that suggestion to the jury, the proponent must first make a showing that the purportedly reliable, authoritative principles are, in fact, reliable and authoritative.[2] If they are not,

---

[2] *See* Tape Recording, House Judiciary Committee on Civil Law, SB 47, Feb 24, 1999, Tape 46, Side B (Representative Uherbelau explains that the foundation requirement is the "safeguard" in the bill).

then the implication to the jury that the expert's opinion is at odds with reliable, authoritative principles will be false. If the foundation requirement is not satisfied, the jury's ability to fairly evaluate the expert's credibility is compromised.

Here, the court allowed the prosecutor to cross-examine Reisberg by quoting a principle from an authority for which the necessary foundation was not laid. That principle was directly contrary to Reisberg's testimony and, thus, gave the jury reason to doubt Reisberg's testimony. Given that that testimony was critical to defendant's case, that error was not harmless.

Reversed and remanded.